# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

LEONARD ROSS,

       Plaintiff,

       v.

UNITED STATES CAPITOL POLICE,

       Defendant.

Civil No. 14-cv-1400 (KBJ)

## MEMORANDUM OPINION

In this employment-discrimination lawsuit, Plaintiff Leonard Ross asserts that

Defendant United States Capitol Police ("USCP" or "Capitol Police")—his prior

employer—forced him to retire and otherwise subjected him to unfavorable treatment

due to his race and in retaliation for his prior engagement in protected activity. Ross is a

plaintiff in an unrelated, longstanding civil-rights lawsuit against USCP; in the instant

case, he alleges that USCP made a discriminatory and retaliatory decision to place him

on administrative leave, rather than a less-restrictive duty status, after a domestic dispute

he had with his wife in late June of 2012. Then, nearly one year later, USCP allegedly

sent Ross a notice of proposed termination that cited a soon-to-lapse restriction on his

use of a firearm as cause, and after he unsuccessfully attempted to contest the proposed

termination, USCP purportedly led him to believe that he could retire in good standing

in lieu of being fired—and thereby retain access to his badge and benefits such as

payment for accrued leave—only to inform him several weeks after he opted to retire

that such was not the case. Ross has filed the instant complaint against USCP to redress this allegedly impermissible series of employment-related actions. He makes two claims: race discrimination (Count I) and retaliation (Count II), both brought under the Congressional Accountability Act of 1995 ("CAA"), 2 U.S.C. § 1311 *et seq.*

Before this Court at present is USCP's motion to dismiss Ross's complaint, or in the alternative, motion for summary judgment. (*See* Def.'s Mot. to Dismiss, or, in the Alternative, Mot. for Summ. J. ("Def.'s Mot."), ECF No. 11, 1–2); Def.'s Mem. in Supp. of Def.'s Mot. ("Def.'s Mem."), ECF No. 11, 3–33). For the reasons explained below, this Court will decline USCP's invitation to treat its pending motion as one for summary judgment at this early stage of the case. With respect to the merits of the motion, this Court concludes that certain of Ross's claims—specifically, his claims that USCP improperly placed him on administrative leave and improperly refused to pay his accrued leave upon his retirement—must be dismissed under Federal Rule of Civil Procedure 12(b)(1) because they are based on events for which Ross has failed to satisfy certain non-waivable jurisdictional prerequisites; however, Ross's claims of race discrimination and retaliation stemming from USCP's decision to terminate his employment must be allowed to proceed to discovery, because those claims were adequately exhausted and the related allegations of fact that appear in Ross's complaint are sufficient to state a claim for discrimination and retaliation in violation of the CAA.

Accordingly, USCP's motion will be **GRANTED IN PART** and **DENIED IN PART**, and the claims over which the Court lacks jurisdiction will be **DISMISSED**. A separate order consistent with this Memorandum Opinion will follow.

## I.    BACKGROUND

### A.    Relevant Facts

The following recitation is based on the allegations in Ross's complaint, as well as "documents attached as exhibits or incorporated by reference in the complaint, or documents upon which the plaintiff's complaint necessarily relies[.]" *Page v. Mancuso*, 999 F. Supp. 2d 269, 275 (D.D.C. 2013) (internal quotation marks and citation omitted).

Leonard Ross was employed as a Capitol Police officer from 1984 to 2013. (*See* Compl., ECF No. 1, at 2, ¶¶ 7–8.)[1] During this period of time, Ross, who is an African-American man, pursued litigation against USCP on two separate occasions: first, in 2001, he was a proposed class member in a class action that a group of current and former African-American Capitol Police officers filed in the U.S. District Court for the District of Columbia (*see id.* at 3, ¶ 8); *see also Blackmon-Malloy v. U.S. Capitol Police Bd.*, No. 01-cv-02221 ("*Blackmon-Malloy* class action"); and second, in 2002, he filed an individual action against the Capitol Police Board alleging employment discrimination, which was consolidated with the *Blackmon-Malloy* class action in 2005. (*See* Compl. at 3–4, ¶¶ 8–10.)  The *Blackmon-Malloy* class action continues today, and during all periods relevant here, Ross has been named as a complainant in that action's governing complaint.  (*Id.*); *see also* Joint Fourth Am. Class Action Compl., ¶¶ 56, 63, *Blackmon-Malloy v. U.S. Capitol Police Bd.*, No. 01-cv-02221, (D.D.C. May 10, 2010), ECF No. 278 (referencing Ross); Proposed Joint Fifth Am. Consolidated Class Action

---

[1] Page-number citations to the documents the parties have filed refer to the page numbers that the Court's electronic filing system automatically assigns.  This opinion refers to the paragraphs of the complaint by the designations Plaintiff gives them.

Compl., ¶¶ 217–224, *Blackmon-Malloy v. U.S. Capitol Police Bd.*, No. 01-cv-02221,

(D.D.C. July 10, 2013), ECF No. 396-2 (doing the same).[2]

The pertinent events for the purpose of the instant action commenced in June and

July of 2012. On June 30, 2012, Ross had a domestic dispute with his ex-wife. (*See*

Compl. at 5, ¶ 16.) According to the complaint, USCP placed Ross on administrative

leave on July 3, 2012, after he self-reported that incident, despite his requests to be

placed on "light duty status" in lieu of administrative leave. (*Id.* at 6, ¶¶ 21–22.) Then,

on July 13, 2012, a protective order (dated July 9) that was rooted in the domestic

dispute was served on Ross, and, among other things, the order prohibited him from

possessing a firearm for an entire year—until July 9, 2013. (*See id.* at 5, ¶ 16.)

Nearly one year later, on June 27, 2013, USCP's Human Resources division

("HR") sent Ross a memo notifying him that, "[d]ue to [his] inability to carry a

firearm[,]" HR was recommending that his employment be "terminated for [his] failure

to meet the conditions of employment." (Termination Recommendation, Ex. 10 to Pl.'s

Opp'n to Def.'s Mot., ECF No. 12-14, at 2; *see also* Compl. at 9–10, ¶ 29 (discussing

termination recommendation letter).)[3] The memo further explained that Ross had the

option of retiring "in lieu of involuntary separation prior to the effective date of the

termination action[,]" and that he would "remain in an administrative leave status

pending final approval of [his] termination of employment." (Termination

---

[2] The Court takes judicial notice of the stated facts regarding the *Blackmon-Malloy* class action. *See Gosen v. U.S. Citizenship and Immigration Servs.*, 75 F. Supp. 3d 279, 293 & n.9 (D.D.C. 2014) (explaining that courts may take judicial notice of public records from other proceedings and citing cases).

[3] It is undisputed that it is a general requirement of USCP that officers be able to carry a firearm. (*See* Termination Recommendation at 2.)

Recommendation at 2.) The memo also stated that Ross could appeal the Human Resources division's termination recommendation to Police Chief Kim C. Dine. (*Id.*)

Ross elected to appeal, and on August 15, 2013, the Chief determined that there was no "basis in the record to concur with Ross's argument[]" that his employment should not be terminated. (Letter Regarding Appeal of Recommendation for Termination of Employment ("Appeal Decision Letter"), Ex. 14 to Pl.'s Opp'n to Def.'s Mot., ECF No. 12-16, at 2; *see also* Compl. at 10–11, ¶ 34 (discussing and quoting from the Chief's decision letter).) In the letter, the Chief emphasized that the proposed termination stemmed from Ross's inability to perform his duties because he could not carry a firearm, and with respect to the fact that the protective order had expired at that point and thus no longer served as an impediment to Ross's ability to possess a firearm, the letter stated that "[a]nytime an employee is unable to perform the essential functions of the position, the fact that he or she can now perform the duties is irrelevant" because the "issue is whether the essential functions of the position could be performed during the period in question." (Appeal Decision Letter at 3.) Concluding that Ross's "termination from employment . . . [was] the only appropriate personnel action[,]" the letter explained that the Chief's decision to move forward with the termination of Ross's employment would be sent to the Capitol Police Board, which, by statute, had thirty days from receipt of the decision to approve or disapprove the determination. (*Id.* at 4); *see also* 2 U.S.C. § 1907(e)(1)(B). At the end of the letter, the Chief also reminded Ross that he could "of course, opt to resign or retire at any time prior to final approval by the Capitol Police Board." (Appeal Decision Letter at 4.)

After receiving Chief Dine's letter, Ross visited Human Resources to discuss next steps. In the complaint, Ross avers that an HR employee told him that he would leave in good standing and would retain certain benefits—such as a "Retired Badge" and "Retirement Credentials"—if he opted to retire. (Compl. at 11–12, ¶ 38.) Ross alleges that he elected to retire, rather than waiting to be terminated, based on that representation, and that, when he did so, he was permitted to retain the retirement credentials and badge that are associated with retiring in good standing. (*See id.*)

However, on September 13, 2013, HR sent Ross a letter informing him that, "[g]iven your retirement in lieu of termination, as sustained by the Capitol Police Board, you did not retire in good standing[,]" and therefore, "the Retirement Credentials were issued to you in error and need to be returned." (Letter from Jacqueline J. Whitaker to Leonard Ross ("Credential Return Letter"), Ex. 19 to Pl.'s Opp'n to Def.'s Mot., ECF 12-21, at 2; *see also* Compl. at 12, ¶ 39 (referencing and discussing the letter requesting the return of his credentials).) The letter also stated that Ross's accrued annual leave payment would not be sent to him until he had returned the badge and credentials. (*See* Credential Return Letter at 2; *see also* Compl. at 12, ¶ 39–40.) According to the complaint, Ross refused to return the items, and as a result, he did not receive payment for more than 250 hours of accrued annual leave—an amount he says totals more than $12,600. (*See* Compl. at 12, ¶ 40.)

## B. Procedural History

On August 15, 2014, Ross filed the instant two-count complaint, claiming race discrimination and retaliation in violation of the CAA. In the complaint, four discrete acts of USCP are alleged as the basis for the discrimination and retaliation contentions, and all four acts are purportedly applicable to both claims: (1) the "deci[sion] to

terminate [Ross] based on his inability to carry a firearm due to a Civil Protective Order and thereby force his involuntary retirement"; (2) the "fail[ure] to conduct and complete a timely and appropriate investigation into" the conduct leading to the protective order, which allegedly would have cleared him; (3) the "fail[ure] to grant [Ross's] request to be assigned light duty in lieu of administrative leave"; and (4) the finding that he did not retire in good standing and consequent refusal to pay his annual-leave lump sum. (*Id.* at 13, ¶¶ 4–7; *id.* at 14, ¶¶ 12–15.)

On January 16, 2015, USCP filed a motion to dismiss the complaint, or in the alternative, for summary judgment, arguing that (1) Ross's failure to satisfy certain jurisdictional prerequisites deprives this Court of subject-matter jurisdiction over every claim in the complaint except USCP's decision to terminate his employment and allegedly force his retirement (*see* Def.'s Mot. at 1); (2) "a recommendation for termination is not an adverse action" and Ross has failed to allege that he suffered any such action because he "opted to retire *before* a final decision could be made" (*id.* at 1– 2 (emphasis in original); and (3) in the alternative, USCP is entitled to summary judgment on the claims that are based on Ross's termination and the withholding of his annual leave, in light of evidence that was submitted contemporaneously with the motion and that, according to USCP, demonstrates that it had a "legitimate business reason" for these actions (*id.* at 2).

Ross has opposed all of these dismissal arguments, but has also specifically disclaimed any desire to rely on his failure-to-investigate assertions as independent grounds for relief. (*See* Pl.'s Opp'n to Def.'s Mot. ("Pl.'s Opp'n"), ECF No. 12, at 13– 14.) With respect to USCP's request for summary judgment, Ross has also asserted

that, due to the many "factual conflicts" that will "require credibility determinations" in this case, "Defendant is not entitled to summary judgment and discovery in this matter should proceed." (*Id.* at 23.)

USCP's motion is now ripe for decision. (*See* Def.'s Reply, ECF No. 13; *see also* Pl.'s Sur-Reply in Opp'n to Def.'s Mot., ECF No. 16.)

## II. LEGAL STANDARDS

### A. Federal Rules Of Civil Procedure 12(b)(1) And 12(b)(6)

A defendant may request that a complaint be dismissed for lack of subject-matter jurisdiction. *See* Fed. R. Civ. P. 12(b)(1). When a defendant deploys Rule 12(b)(1), it is the plaintiff's burden to establish that the court has jurisdiction by a preponderance of the evidence, *see Delta Air Lines, Inc. v. Exp.-Imp. Bank of U.S.*, 85 F. Supp. 3d 250, 259 (D.D.C. 2015) (citing, *inter alia*, *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)); *see also Moran v. U.S. Capitol Police Bd.*, 820 F. Supp. 2d 48, 53 (D.D.C. 2011), and if the plaintiff fails to do so, the court must dismiss the complaint, *see, e.g.*, *Moran*, 820 F. Supp. 2d at 55. Although the reviewing court must "treat the complaint's factual allegations as true" and "grant plaintiff[s] the benefit of all inferences that can be derived from the facts alleged[,]" the "factual allegations in the complaint" receive "closer scrutiny in resolving a 12(b)(1) motion than in resolving a 12(b)(6) motion for failure to state a claim." *Delta Air Lines*, 85 F. Supp. 3d at 259 (first alteration in original) (internal quotation marks and citation omitted). Furthermore, unlike the Rule 12(b)(6) context, the Court "may consider materials outside the pleadings" in resolving the Rule 12(b)(1) question. *Id.* (internal quotation marks and citation omitted).

A motion under Rule 12(b)(6) raises the question of whether the complaint contains "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Harris v. D.C. Water & Sewer Auth.*, 791 F.3d 65, 68 (D.C. Cir. 2015) (internal quotation marks omitted) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). The Supreme Court has explained that the key to making this evaluation is determining whether the allegations are sufficient to permit a "reasonable inference that the defendant is liable for the misconduct alleged[.]" *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 46 (2011) (internal quotation marks and citations omitted). In this regard, the "court must accept as true all of the allegations contained in a complaint[,]" but this tenet "is inapplicable to legal conclusions." *Harris*, 791 F.3d at 68 (internal quotation marks omitted) (quoting *Iqbal*, 556 U.S. at 678). This means that "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (alteration in original) (internal quotation marks omitted) (quoting *Iqbal*, 556 U.S. at 678).

Unlike Rule 12(b)(1), Rule 12(b)(6) "places th[e] burden on the moving party" to show that the complaint is legally insufficient. *Cohen v. Bd. of Trustees of the Univ. of the Dist. of Columbia*, 819 F.3d 476, 481 (D.C. Cir. 2016) (citing 5B Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1357 (3d ed. 2015)). And when analyzing a motion to dismiss brought under Rule 12(b)(6), the court must limit its analysis to the four corners of the complaint, as well as any "documents attached as exhibits or incorporated by reference in the complaint, or documents upon which the plaintiff's complaint necessarily relies[.]" *Page*, 999 F. Supp. 2d at 275 (internal quotation marks and citations omitted).

**B. Motions Styled As "Motions To Dismiss, Or In The Alternative, For Summary Judgment" In Employment-Discrimination Cases**

In the instant case, Defendant USCP has filed a motion to dismiss under Rules 12(b)(1) and 12(b)(6), and has also asked, alternatively, for this Court to treat its motion as one for summary judgment under Rule 56. (*See* Def.'s Mot. at 1–2.) A motion for summary judgment requires the movant to "show[] that there is no genuine dispute as to any material fact and [that] the movant is entitled to judgment as a matter of law[,]" Fed. R. Civ. P. 56(a), which is a hurdle that is typically mounted through the submission of declarations and other evidence. To this end, USCP points to various documents from its own files and argues that entry of summary judgment in its favor should be granted, even at this early stage of the litigation, because its evidence establishes that USCP had legitimate business reasons for recommending that Ross's employment be terminated and for withholding his accrued annual leave. (*See* Def.'s Mot. at 2.) Notably, the decision regarding whether or not to treat a motion to dismiss as one for summary judgment "is committed to the sound discretion of the trial court[,]" *see Page*, 999 F. Supp. 2d at 275–76 (internal quotation marks and citations omitted); *see also* 5C Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1366 (3d ed. 2004), which means that this Court need not necessarily accede to USCP's request regarding how its motion should be evaluated. For the following reasons, this Court will decline USCP's invitation.

First and foremost, it is well established that "summary judgment ordinarily 'is proper only after the plaintiff has been given adequate time for discovery.'" *Americable Int'l, Inc. v. Dep't of Navy*, 129 F.3d 1271, 1274 (D.C. Cir. 1997) (quoting *First Chicago Int'l v. United Exch. Co.*, 836 F.2d 1375, 1380 (D.C. Cir. 1988)). This Court

has an independent obligation to ensure that the requested acceleration to summary judgment is fair to all parties, *see Page*, 999 F. Supp. 2d at 276, and indeed, having reasonable access to discovery seems inherent in the standards that courts apply when assessing the adequacy of arguments in opposition to a summary-judgment motion. That is, even though the movant (typically, the defendant) bears the burden of establishing that there are no genuine issues of material fact for trial in order to be granted summary judgment, the non-movant (usually, the plaintiff) must "rely on evidence" to stave off summary judgment, and its "opposition must consist of more than mere unsupported allegations or denials[.]" *Rochon v. Lynch*, 139 F. Supp. 3d 394, 401 (D.D.C. 2015) (internal quotation marks and citations omitted); *see also id.* (explaining that the opposition brief "must be supported by affidavits, declarations, or other competent evidence, setting forth specific facts showing that there is a genuine issue for trial" (internal quotation marks and citations omitted)); *see also Potter v. District of Columbia*, 558 F.3d 542, 549 (D.C. Cir. 2009). Thus, in this Court's view, the cases in which a plaintiff will be fairly held to the task of opposing summary judgment without first being afforded the opportunity to take discovery will be few and far between. *Cf. Khan v. Parsons Global Servs., Ltd.*, 428 F.3d 1079, 1087 (D.C. Cir. 2005) (observing that the nonmovant "needs a reasonable opportunity to complete discovery before responding to a summary judgment motion" and that "insufficient time or opportunity to engage in discovery is cause to defer decision on the motion" (internal quotation marks and citations omitted)).

Second, and perhaps even more important, this Court considers it especially problematic to permit acceleration to summary judgment at the pre-discovery stage *in*

*employment-discrimination cases*, because plaintiffs with such claims ordinarily must marshal the kinds of evidence that one usually can only gather during the discovery phase in order to carry their burden of establishing that the legitimate reasons the defendant has proffered are, in fact, pretextual, and that the real reason for the adverse employment action is a prohibited one. *See Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 493–94 (D.C. Cir. 2008) (examining application of the Supreme Court's *McDonnell Douglas* burden-shifting framework).[4] It is well established that the consequence of the defendant's having provided a legitimate basis for its actions is that "'the *McDonnell Douglas* framework—with its presumptions and burdens— disappear[s],' leaving only the ultimate question of 'discrimination *vel non*[.]'" *Rochon*, 139 F. Supp. 3d at 403 (alterations in original) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142–43 (2000)). This means that, once a non-discriminatory basis for the adverse employment action has been provided, only one "central question" remains for summary-judgment purposes—whether or not the plaintiff has "produced sufficient evidence for a reasonable jury to find that the employer's asserted nondiscriminatory [or non-retaliatory] reason was not the actual

---

[4] The case of *McDonnell Douglas Corporation v. Green*, 411 U.S. 792 (1973), established an "evidentiary standard" that governs "the employee's burden of presenting evidence that raises an inference of discrimination[,]" *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 510 (2002) (internal quotation marks and citation omitted), by "allocat[ing] . . . burdens and order of presentation of proof[,]" *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252 (1981). The standard is applicable to plaintiffs who seek to base their case on indirect evidence, requiring them to first establish a "prima facie case." *Jones v. Bernanke*, 557 F.3d 670, 677 (D.C. Cir. 2009). Successful identification of the prima facie case shifts "the burden of production—but not persuasion . . . to the defendant[,]" who must then "provide 'a legitimate, nondiscriminatory reason[]' for its actions." *Rochon*, 139 F. Supp. 3d at 403 (second alteration in original) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000)). And if the defendant proffers such a reason, the burden shifts back to the plaintiff to show that a reasonable jury could find that the proffered nondiscriminatory or non-retaliatory reason "was not the actual reason and that the employer intentionally discriminated [or retaliated] against" the plaintiff. *Allen v. Johnson*, 795 F.3d 34, 39 (D.C. Cir. 2015) (alteration in original) (internal quotation marks and citation omitted).

reason and that the employer intentionally discriminated [or retaliated] against the [plaintiff][,]" *Allen v. Johnson*, 795 F.3d 34, 39 (D.C. Cir. 2015) (first and second alterations in original) (internal quotation marks omitted) (quoting *Brady*, 520 F.3d at 494)—and if this question arises pre-discovery by virtue of a defendant's alternative motion for summary judgment, it is hard to fathom that the plaintiff would be able to present any evidence related to the employer's reasons for the adverse employment action *at all*, much less evidence that would be a sufficient basis upon which a rational jury could conclude that "the defendant intentionally discriminated [or retaliated] against the plaintiff." *Brady*, 520 F.3d at 494 (internal quotation marks and citation omitted).

What is more, in this Court's view, it is entirely consistent with the Federal Rules and existing case law to reason that, when an employment-discrimination complaint has been properly pled (*i.e.*, if the complaint survives the scrutiny visited upon it by the defendant's Rule 12 motion) then the plaintiff has, in essence, *earned* the right to proceed to the discovery phase. *See Matrixx Initiatives*, 563 U.S. at 46 (explaining that, to survive a motion to dismiss, the complaint must contain "allegations suffic[ient] to 'raise a reasonable expectation that discovery will reveal evidence'" of wrongdoing (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007))). As explained, the right to conduct discovery is crucial in employment-discrimination cases, and Rule 26 of the Federal Rules of Civil Procedure authorizes the plaintiff-employee to gather whatever evidence exists related to the defendant's reasons for the challenged employment action during the discovery process. Thus, when a plaintiff claiming discrimination or retaliation files a complaint that establishes the court's jurisdiction

and states a claim based on plausible factual allegations against the defendant, this Court sees no good reason to permit a defendant to jump the gun in seeking termination of that legal action on evidence-based grounds (and termination is, indeed, the likely outcome if a court accepts a defendant's "alternative" proposal to construe its pre-discovery motion as one for summary judgment, and proceeds to evaluate the evidence that the defendant presents regarding its motivations before the plaintiff has a reasonable opportunity to collect favorable evidence of his own).

Accordingly, it is this Court's ordinary practice to deny a defendant's request that the Court consider evidence regarding the employer's reasons for undertaking the challenged employment action when the defendant submits such evidence along with a pre-discovery motion in cases involving claims of employment discrimination. And because it sees no reason to depart from this practice here, the Court will decline to treat USCP's motion as one for summary judgment.

## C.      The Congressional Accountability Act

Finally, it is important to appreciate the substantive legal standards that govern the claims that have been brought in the instant case. As mentioned, Ross's discrimination and retaliation claims arise under the Congressional Accountability Act, which makes Title VII's protections applicable to "covered employees" of the federal legislative branch. *See* 2 U.S.C. § 1301(3); *id.* § 1311(a); *Blackmon-Malloy v. U.S. Capitol Police Bd.*, 575 F.3d 699, 701 (D.C. Cir. 2009); *see also* 2 U.S.C. § 1301(3)(D) (providing that a "covered employee" includes an employee of the Capitol Police). The CAA generally incorporates most of Title VII's substantive law, *see Blackmon-Malloy*, 575 F.3d at 701, and "[c]ourts have consistently relied on judicial interpretations of Title VII when addressing the substance of employment discrimination . . . and

retaliation claims brought under the CAA." *Newton v. Office of the Architect of the Capitol*, 905 F. Supp. 2d 88, 92 (D.D.C. 2012) (footnote and citation omitted) (collecting cases). Thus, while the statutes that govern this case are found at sections 1311 and 1317 of Title 2 of the U.S. Code, *see* 2 U.S.C. § 1311(a)(1) (incorporating Title VII's antidiscrimination provisions); *id.* § 1317 (the CAA's independent retaliation provision), Title VII cases prescribe the substantive legal standards that are applicable to an evaluation of the complaint's allegations of racial discrimination and retaliation.

Significantly for present purposes, while the CAA largely mirrors Title VII's substantive standards, the CAA has "its own comprehensive administrative regime— including jurisdictional provisions." *Blackmon-Malloy*, 575 F.3d at 706. For example, the CAA expressly conditions subject-matter jurisdiction on the covered employee's completion of counseling and mediation for the particular claim that the employee seeks to bring in federal court. *See* 2 U.S.C. 1408(a). A request for counseling must be submitted to the Office of Compliance (an office the CAA established for this purpose) "not later than 180 days after the date of the alleged violation." 2 U.S.C. § 1402(a). Barring any changes agreed upon by the employee and the Office, this counseling period runs for 30 days, beginning on the day the Office receives the counseling request, and the Office must "notify the employee in writing when the counseling period has ended." *Id.* § 1402(b)–(c). Then, no later than 15 days after the employee receives the "notice of the end of the counseling period[,]" the employee must "file a request for mediation with the Office." *Id.* § 1403(a). The mediation period, too, lasts for 30 days from the day the Office receives the mediation request, unless extended by

joint decision of the parties, and the Office must notify the employee and his employer in writing at the end of the process. *See id.* § 1403(c). And no sooner than 30 days but no later than 90 days after the mediation period ends, an employee must either file an administrative complaint with the Office or, as relevant here, file a civil complaint in federal district court. *See id.* § 1404.

This all means that a federal district court has subject-matter jurisdiction over a CAA discrimination or retaliation claim only if the plaintiff-employee has completed counseling and mediation at the administrative level with respect to the claim asserted, and even then, only if that plaintiff commences an action in district court within the time frame prescribed by statute. And the plaintiff must run this gantlet of requirements for each of the "discrete acts [he] contends amounted to discrimination"; if he fails to do so, the claims "arising from such conduct w[ill] fall outside [the] Court's subject-matter jurisdiction." *Schmidt v. U.S. Capitol Police Bd.*, 826 F. Supp. 2d 59, 68 (D.D.C. 2011); *see also Halcomb v. Office of Senate Sergeant-at-Arms of U.S. Senate*, 563 F. Supp. 2d 228, 237 (D.D.C. 2008) (explaining that the plaintiff could not maintain claims based on "allegations as to acts that occurred . . . outside of the [CAA's] 180-day statutory period" for requesting counseling), *aff'd*, 368 F. App'x 150 (D.C. Cir. 2010); *cf. Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002) (observing, in the Title VII context, that "discrete discriminatory acts are not actionable if time barred"). Furthermore, as with all questions of subject-matter jurisdiction, the plaintiff bears the burden of proving by a preponderance of the evidence that these prerequisites are satisfied. *See Landmark Health Sols., L.L.C v. Not For Profit Hosp. Corp.*, 950 F. Supp. 2d 130, 132–33 (D.D.C. 2013) (citing *Lujan*, 504 U.S. at 561).

One notable procedural complexity that can occur within this framework involves the treatment of evidence or allegations regarding a discrete discriminatory act that, due to the plaintiff's failure to satisfy the CAA's statutory exhaustion requirements, cannot itself be a basis upon which to bring the plaintiff's employment-discrimination claim.  In this situation, courts have concluded that the fact that a discrete act of alleged discrimination is not justiciable does not render that act irrelevant (as an evidentiary matter) with respect to prosecution of other, timely claims.  To the contrary, evidence and allegations with respect to untimely acts of discrimination or retaliation may well be considered "as background evidence in support of a timely claim" about another alleged occurrence.  *Morgan*, 536 U.S. at 113; *see, e.g.*, *Halcomb*, 563 F. Supp. 2d at 238 (citing *Morgan*, and explaining that, while the plaintiff had not satisfied the CAA's jurisdictional prerequisites with respect to certain events and thus could not maintain claims based on those events, she could still use those events "as evidentiary background support for her actionable claims").

## III.  ANALYSIS

Of the three allegedly discriminatory and retaliatory actions that Ross claims USCP took against him and for which he intends to hold USCP liable—(1) placing him on administrative leave, (2) refusing to return his accrued leave, and (3) forcing him to retire by threatening to fire him for unjustifiable reasons—only the last can form the basis of a claim that can be permitted to proceed past the Rule 12 stage of this case. This is because, as explained below, Ross has failed to satisfy the procedural prerequisites of the CAA with respect to his claims regarding USCP's administrative leave and accrued leave decisions, and as a result, this Court lacks subject-matter

jurisdiction over those claims. The statutory requirements have been met, however, with respect to Ross's contention that USCP terminated his employment with discriminatory and retaliatory intent by forcing him into retirement, which means that this Court does have jurisdiction over the discrimination and retaliation claims that Ross brings on that basis. Furthermore, Ross's complaint alleges facts that relate, *inter alia*, to a plausible theory of constructive discharge, and these facts, if true, would be sufficient to establish Ross's discrimination and retaliation claims against USCP. Thus, USCP's motion—which this Court has treated solely as a motion to dismiss—will be granted in part and denied in part, and the case will continue with respect to the improper termination aspect of Ross's complaint.

### A. This Court Lacks Jurisdiction Over Ross's Claims That USCP Placed Him On Administrative Leave And Withheld Accrued Annual Leave Payments With Discriminatory and Retaliatory Intent, But The Court Does Have Jurisdiction Over Ross's Claims That He Was Forced To Retire Due To Race Discrimination And Retaliation

USCP argues that Ross failed to satisfy the statutory prerequisites to filing a lawsuit with respect to the discrimination and retaliation claims that relate to his administrative-leave placement and the withholding of his accrued leave, and thus, that this Court must dismiss those claims under Federal Rule of Civil Procedure 12(b)(1). (*See* Def.'s Mot. at 1); *see also* 2 U.S.C. §§ 1402, 1403(a), 1404(2), 1408(a) (establishing that a plaintiff (1) must submit a request for counseling no later than 180 days after the date of the alleged violation; (2) must file a request for mediation no later than 15 days after receiving notice of the end of the counseling period; and (3) must file his complaint no later than 90 days after mediation ended). This Court has carefully examined the arguments and evidence that both parties have submitted, *see Council for Urological Interests v. Sebelius*, 668 F.3d 704, 713 (D.C. Cir. 2011) (explaining that

18

materials outside of the pleadings may be considered to resolve a Rule 12(b)(1) motion), and it finds that USCP is correct with respect to the untimeliness of Ross's administrative-leave-placement and accrued-leave claims, as explained below. This Court also concludes, pursuant to its own efforts to ensure that it has subject-matter jurisdiction over Ross's remaining claims, *see Love v. Vilsack*, 908 F. Supp. 2d 139, 144 n.7 (D.D.C. 2012), that Ross has satisfied the statutory prerequisites with respect to his claims that he was forced into retirement as an act of discrimination and retaliation, which means that there is no jurisdictional bar to those claims proceeding in this Court.

1. Ross Propounded Two Counseling Requests, One Mediation Request, And A Civil Complaint, Alleging Various Discrete Acts Of Discrimination And Retaliation

On November 1, 2013, Ross filed a formal request for counseling in which he complained about his placement on administrative leave, and also charged USCP with "constructively discharg[ing]" him by forcing him to retire against his wishes via a threat of termination. (*See* Collected Administrative Documents, Ex. 1 to Pl.'s Opp'n, ECF No. 12-3, at 3–4; Notice of Invocation of Mediation, Ex. 6 to Def.'s Mot., ECF No. 11-7, at 2.)[5] The associated counseling period ran from November 1, 2013, to December 2, 2013, and Ross received the notification of the end of the counseling period no earlier than December 3, 2013. (*See* Collected Administrative Documents at 6). Ross requested mediation on December 16, 2013, which was within fifteen days of that notification. (*See id.* at 8.) The mediation period ended on May 21, 2014 (*see*

---

[5] Ross dated his counseling request October 22, not November 1 (*see* Collected Administrative Documents at 3), and it is unclear why internal record documents indicate that his formal request was submitted on November 1. However, both parties agree that November 1 is the appropriate date (*see* Compl. at 2, ¶ 2; Def.'s Mem. at 15), and nothing turns on this discrepancy, since the timeline for the next step in the administrative process (mediation) commences upon "receipt by the employee of notice of the end of the counseling period[,]" 2 U.S.C. § 1403(a), and there is no question about that date.

Office of Compliance Certification, Ex. 1 to Def.'s Reply, ECF No. 13-1, at 2), after apparently being extended, as the statute permits, *see* 2 U.S.C. § 1403(c).

In the midst of this process, on March 12, 2014, Ross filed a second request for counseling in which he complained about USCP's failure to pay him accrued leave. (*See* Formal Request for Counseling, Ex. 2 to Pl.'s Opp'n, ECF No. 12-4, at 2–3.) No documents in the record before this Court indicate when that counseling period ended; nor do any documents reflect that Ross filed any request for mediation associated with this second request.

Ross filed his complaint in this Court on August 15, 2014. (*See generally* Compl.) The complaint alleges that USCP discriminated and retaliated against him in violation of the CAA in three ways: by placing him on administrative leave rather than light duty status; by refusing to give him accrued leave payments that were owed to him; and by forcing him to retire against his will (as mentioned, the allegations regarding USCP's purported failure to investigate do not support an independent claim).

    2. <u>Ross's Claims That Relate To Administrative Leave And Accrued Leave Are Untimely</u>

The foregoing facts make the jurisdictional inquiry relatively straightforward. Beginning with the administrative-leave claim, there is no doubt that Ross completed counseling and mediation over his grievance regarding administrative leave and filed a complaint in this Court within 90 days of the close of mediation on the matter, as the statute requires, *see* 2 U.S.C. § 1404(2). But the Court lacks jurisdiction over the administrative-leave claim nevertheless because USCP had placed Ross on administrative leave on July 3, 2012 (*see* Compl. at 6, ¶ 21)—more than 15 months prior to the counseling request of November 1, 2013—which is certainly much earlier

than the 180-day interval that the statute permits between the complained-of event and the counseling request.

In response to this glaring problem, Ross argues that his administrative-leave claims are timely because he did not *realize* that Defendant's choice to place him on administrative leave was motivated by discriminatory or retaliatory intent until July 1, 2013 (nearly a year after the decision was made and executed) and, counting from the date of this belated discovery, his counseling request was made well within the window of opportunity for present purposes. (*See* Pl.'s Opp'n at 9–12.)[6] With respect to Ross's argument that this Court should credit his "realization" date and, thus, find that he made a timely request for counseling, Ross's contention fails under well-established law.

In similar CAA cases in this district, Title VII's "notification rule" has been applied; that rule directs that "the limitations period begins to run on the date" that a given employment decision is "made and communicated to [the employee]." *Gordon v. Office of the Architect of the Capitol*, 928 F. Supp. 2d 196, 204 (D.D.C. 2013) ("*Gordon II*") (alteration in original) (internal quotation marks omitted) (quoting *Del. State Coll. v. Ricks*, 449 U.S. 250, 258 (1980)); *see also Gibson v. Office of Architect of the Capitol*, No. 002424, 2002 WL 32713321, at *4 (D.D.C. Nov. 19, 2002) (finding CAA claim untimely under the notification rule), *summarily aff'd*, No. 03-5031, 2003 WL 21538073 (D.C. Cir. July 2, 2003). It is clear beyond cavil that, when employing the notification rule, "courts must focus on the employer's action, not on the

---

[6] Ross further suggests that the Court should apply the doctrine of equitable tolling in this context (*see* Pl.'s Opp'n at 12); however, binding precedent forecloses the use of equitable tolling or related doctrines to waive the CAA's jurisdictional requirements, *see Blackmon-Malloy*, 575 F.3d at 702, 704–06; *Gordon v. Office of the Architect of the Capitol*, 928 F. Supp. 2d 196, 203 n.6 (D.D.C. 2013) ("*Gordon II*").

employee's subjective beliefs." *Gordon II*, 928 F. Supp. 2d at 205 (citation omitted) (collecting cases); *cf. Crandall v. Paralyzed Veterans of Am.*, 146 F.3d 894, 896 (D.C. Cir. 1998) (applying *Ricks* and holding the clock began to run when the employee "was notified that his employment was terminated"); *Sharma v. District of Columbia*, 65 F. Supp. 3d 108, 119 n.7 (D.D.C. 2014) (explaining that "the date on which [the plaintiff] fully realize[d] he was a victim of discrimination is not important" and that the key was the date he knew the defendant had denied him his desired reassignment (second alteration in original) (internal quotation marks and citation omitted)); *Fortune v. Holder*, 767 F. Supp. 2d 116, 122 (D.D.C. 2011) ("[N]otice or knowledge of discriminatory motivation is not a prerequisite for a cause of action to accrue. . . . On the contrary, it is knowledge of the adverse employment decision itself that triggers the running of the statute of limitations." (alterations in original) (internal quotation marks omitted) (quoting *Hulsey v. Kmart, Inc.*, 43 F.3d 555, 558 (10th Cir. 1994))). And when the notification rule is applied to the instant circumstances, Ross's administrative-leave-related claims are plainly untimely, given that USCP placed Ross on administrative leave on July 3, 2012, and Ross's counseling request, which occurred on November 1, 2013, occurred more than 450 days after that employment decision.

Ross's attempt to challenge USCP's accrued-leave decision in this Court fails for similar reasons. To be sure, Ross has provided proof that USCP refused payment of his accrued leave on September 13, 2013, and that he made a request for counseling with respect to that refusal on March 12, 2014—exactly 180 days later. (*See* Formal Request for Counseling at 2–3.) However, he offers no evidence that he filed a request for mediation with respect to the accrued-leave issue after he sought counseling on that

matter.  Ross avers that he did not press for mediation with respect to the accrued-leave contention based on the representations of an employee of the Office of Compliance, who allegedly told Ross that, since he had already "discussed the badge and credentials in mediation[,]" he did not "have to file a new complaint with the Office of Compliance because [his] current mediation cover[ed] that."  (Decl. of Leonard Ross, Ex. 3 to Pl.'s Opp'n, ECF No. 12-5, at 9; *see also* Pl.'s Opp'n at 9 (same).  But Ross does not point to any case law that holds that such representations absolve an employee's failure to satisfy the statutory mandate that he "*shall file* a request for mediation[,]" 2 U.S.C. § 1403(a) (emphasis added), and this Court is aware of none.  Put another way, regardless of what an employee of the Office of Compliance might have represented, successful completion of every CAA prerequisite regarding each claim is a *jurisdictional* prerequisite, which means that it cannot be waived by this Court, much less any party or agent of a party.  *See Chevron Mining, Inc. v. NLRB*, 684 F.3d 1318, 1328 (D.C. Cir. 2012) ("[J]urisdictional conditions . . . cannot be waived or forfeited by the parties[.]" (citations omitted)).  Thus, even if true, Ross's contention that he was led to believe that he could forgo mediation is beside the point; in order for this Court to have the authority to consider his challenge to USCP's accrued-leave decision, Ross must show that he filed a request for mediation with respect to that claim.  *Cf. Gordon v. Office of the Architect of the Capitol*, 750 F. Supp. 2d 82, 92 (D.D.C. 2010) ("*Gordon I*") (explaining that the jurisdictional prerequisites must be completed "for each claim" (citation omitted)).  There is no indication in the instant record that Ross made any request for mediation with respect to his accrued-leave claim; and, indeed, he maintains the opposite.  Accordingly, this Court lacks jurisdiction over the discrimination and

retaliation claims that are based in USCP's accrued-leave decision. *See Caul v. U.S. Capitol Police*, No. 15-1243, 2016 WL 2962194, at *7–8 (D.D.C. May 19, 2016) (explaining that a CAA plaintiff "fail[s] to meet h[is] burden to establish jurisdiction" when he "fails to present evidence" that he actually completed the jurisdictional prerequisites (alterations in original) (internal quotation marks and citation omitted)).

### 3. Ross's Claim Regarding Having Been Forced Into Retirement Satisfies The CAA's Jurisdictional Requirements

This Court reaches a different conclusion regarding its authority to consider the discrimination and retaliation claims that arise out of Ross's allegedly forced retirement (insofar as USCP does not contend that these claims are untimely, USCP apparently agrees). The record demonstrates that Ross requested counseling with respect to the termination-related discrimination and retaliation claims on November 1, 2013, which was 127 days after HR mailed him the letter proposing his termination (and 123 days after Ross says he received it). Ross requested mediation on the matter on December 16, 2013—13 days after the Capitol Police mailed him his notice of the end of the counseling period. (*See* Notice of Invocation of Mediation at 2; Collected Administrative Documents at 6–9.) Both requests were well within the time limitations established for counseling and mediation.

Furthermore, insofar as Ross contends that the events leading up to his retirement demonstrate that he was the victim of a constructive discharge (*see* Collected Administrative Documents at 4), the limitations clock related to the counseling and mediation requirements is deemed to run from the point at which he gave notice of his resignation. *See Green v. Brennan*, 136 S. Ct. 1769, 1776, 1782 (2016) (explaining that, in the Title VII context, a constructive-discharge claim accrues when the employee

gives notice of resignation).[7]  And while the record is unclear as to the precise date that Ross resigned, it is reasonable to infer from the complaint's allegations that Ross gave notice of his resignation at some point during the interval between the USCP Chief issuing the letter of August 15, 2013, upholding HR's proposed termination, and August 31, 2013, when Ross was "out-process[ed]" from his position.  (*See* Appeal Decision Letter at 2; Compl. at 10–11, ¶¶ 34, 37–38.)  Ross requested counseling with respect to the termination issue on November 1, 2013—between 78 and 62 days later—and then timely discharged the remaining requirements for mediation and the filing of his lawsuit, as explained above.  Thus, this Court concludes that it does have subject-matter jurisdiction to consider Ross's termination-related discrimination and retaliation claims.

### B.    Ross Has Stated A Claim For Race Discrimination And Retaliation With Respect To His Contention That USCP Forced Him To Retire

What remains at this point in the Court's analysis of Defendant's motion is Ross's claim that USCP waged a discriminatory and retaliatory campaign to terminate his employment by forcing him to resign.  (*See* Compl. at 13–14, ¶¶ 4, 12.)  To survive USCP's motion to dismiss for failure to state a claim, Ross's complaint must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Harris*, 791 F.3d at 68 (internal quotation marks omitted) (quoting *Iqbal*, 556 U.S. at 678).  And as noted previously, where the plaintiff is an employee of the legislative branch who claims that he suffered unlawful race discrimination and retaliation in violation of the CAA, the complaint

---

[7] This Court finds that the Supreme Court's recent holding in *Green* applies to Ross's constructive-discharge claims, which are brought under the CAA, because these CAA claims are substantively indistinguishable from Title VII claims, and nothing about the CAA evinces Congress's intent to reject the principle that limitations periods run only after the complete cause of action accrues.

must contain factual allegations from which an inference can be drawn that the defendant has transgressed the antidiscrimination and antiretaliation principles of Title VII. *See supra* Part II.C; *see also Newton*, 905 F. Supp. 2d at 92 (explaining that courts "have consistently relied on judicial interpretations of Title VII when addressing the substance of employment discrimination . . . and retaliation claims brought under the CAA" (footnote and citation omitted)).

Title VII's antidiscrimination provision expressly prohibits harmful employment actions against a person "because of [his or her] race, color, religion, sex, or national origin[,]" 42 U.S.C. § 2000e-2(a)(1), and to bring a successful claim under this standard, a plaintiff must allege and show (1) that he "suffered an adverse employment action" (2) because of one of those protected characteristics, *Brady*, 520 F.3d at 493.[8] To establish unlawful retaliation in violation of 42 U.S.C. § 2000e-3(a), which is Title VII's distinct antiretaliation provision, a plaintiff must show (1) that he engaged in an activity that Title VII protects, (2) that his employer took a materially adverse action against him, and (3) that the employer took the action because of the protected activity, *i.e.*, that the protected activity was a but-for cause of the adverse action. *See Univ. of Texas Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2534 (2013); *McGrath v. Clinton*, 666 F.3d 1377, 1380 & n.3 (D.C. Cir. 2012); *Jones v. Bernanke*, 557 F.3d 670, 677 (D.C. Cir. 2009).

---

[8] A plaintiff can satisfy the "because of" requirement by showing that his protected characteristic was a "but for" cause of the adverse action, *Ponce v. Billington*, 679 F.3d 840, 844 (D.C. Cir. 2012), or, alternatively, he can show that the protected characteristic was just "a factor motivating" the adverse action. *Id.* (internal quotation marks and citation omitted). The particular path that a plaintiff will pursue in establishing the "because of" element need not be specified in the complaint, nor does it matter where, as here, the plaintiff has alleged sufficient facts to support the more demanding "but for" requirement. *See id.* at 845 (explaining that path selection is not required at the Rule 12 stage and that "if unlawful discrimination is the but-for cause of an adverse employment action, it is necessarily a motivating factor as well" (internal quotation marks omitted)).

For the reasons explained below, this Court concludes that Ross's complaint states a claim for discrimination and retaliation in violation of the CAA, because the complaint contains sufficient facts to support Ross's contention that he suffered an adverse employment action due to his race and/or his prior protected activity. Put another way, because the complaint plausibly asserts that Ross was forced to retire involuntarily because USCP made a threat to terminate his employment that was motivated by racial animus and/or by the fact that he was a lead plaintiff in a longstanding class action against USCP, Ross's termination-related discrimination and retaliation claims are sufficient to survive USCP's motion to dismiss.

1. By Stating Plausible Facts Related To An Allegedly Discriminatory Constructive Discharge, The Complaint Adequately Alleges That Ross Suffered An Adverse Employment Action That Occurred Because Of His Race

As explained, the linchpin of a successful Title VII discrimination claim is a demonstration that the employer took an "adverse employment action" against the plaintiff because of his race, ethnicity, gender or other protected characteristic. *Brady*, 520 F.3d at 493; *see also* 42 U.S.C. § 2000e-2(a)(1). Notably, an "adverse employment action" has a specific, established meaning in the Title VII status-based discrimination context: the plaintiff must show that the complained-of action by the employer constituted "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing significant change in benefits." *Baird v. Gotbaum*, 662 F.3d 1246, 1248 (D.C. Cir. 2011) (internal quotation marks and citation omitted). In other words, even if there is a discriminatory motive, not every workplace slight will do; instead, the employee must have experienced "materially adverse consequences affecting the terms,

conditions, or privileges of employment or future employment opportunities such that a reasonable trier of fact could find objectively tangible harm." *Id.* at 1248–49 (internal quotation marks and citation omitted).

As noted, an employer's termination of the employment relationship (*i.e.*, his discharge of the employee) is a "quintessential" adverse employment action for Title VII purposes. *Ryan-White v. Blank*, 922 F. Supp. 2d 19, 27 (D.D.C. 2013). Furthermore, "'[i]n certain cases, the doctrine of *constructive* discharge enables an employee to . . . demonstrate she suffered an adverse employment action[.]" *Stewart v. Gates*, 786 F. Supp. 2d 155, 163 (D.D.C. 2011) (second alteration in original) (emphasis added) (internal quotation marks and citation omitted)). Generally speaking, a constructive discharge occurs if "an employer discriminates against an employee to the point . . . that a reasonable person in the employee's position would have felt compelled to resign[,]" *Green*, 136 S. Ct. at 1776 (internal quotation marks and citation omitted); under such circumstances, the employee's resignation (which would otherwise be presumed to have been tendered voluntarily, *see Stewart*, 786 F. Supp. 2d at 167), is deemed "tantamount to an actual discharge" for the purpose of evaluating whether the employee suffered an adverse employment action, *Green*, 136 S. Ct. at 1777. This well-established doctrine makes eminent sense, because it prevents employers from "indirectly effect[ing] a discharge that would have been forbidden by statute if done directly." *Simpson v. Fed. Mine Safety & Health Review Comm'n*, 842 F.2d 453, 461 (D.C. Cir. 1988).

Notably, although courts have pointed to various factors when deciding whether or not an employee who resigns or retires can rely upon the constructive-discharge

doctrine to satisfy the adverse action requirement, the Supreme Court recently reiterated that the overarching and essential question is whether "a reasonable person in the employee's position would have felt compelled to resign" under the circumstances presented. *Green*, 136 S. Ct. at 1776 (internal quotation marks omitted) (quoting *Pa. State Police v. Suders*, 542 U.S. 129, 141 (2004)); *see also Stewart*, 786 F. Supp. 2d at 168 (stating that "[a]n actionable constructive discharge claim" requires a plaintiff to show, *inter alia*, that "the employer deliberatively made working conditions intolerable" and that "aggravating factors" justify the plaintiff's decision to quit, but also acknowledging that the court's goal is to make an objective assessment of "whether a reasonable person in the employee's position would have felt compelled to resign" (internal quotation marks and citations omitted)). And, significantly for present purposes, much of the guess-work related to answering this question is eliminated where, as here, the plaintiff alleges that he involuntarily tendered his resignation because of a "thinly veiled (or even overt) threat[] of termination" by his employer. *Robinson v. Ergo Sols., LLC*, 85 F. Supp. 3d 275, 283 (D.D.C. 2015) (internal quotation marks omitted) (quoting *Kalinoski v. Gutierrez*, 435 F. Supp. 2d 55, 78 (D.D.C. 2006)); *see also Richardson v. Petasis*, No. 13-00826, 2015 WL 8082244, at *28 (D.D.C. Dec. 7, 2015) (denying summary judgment where a reasonable employee could have "interpret[ed] [the] employer's actions as 'a sign of imminent termination' and as an indication that [the employer] no longer wanted her to remain an employee"). Thus, if a plaintiff alleges that he was the recipient of a discriminatory threat of termination and includes allegations of fact that make plausible the contention that a rational employee would have resigned or retired—*i.e.*, facts demonstrating that, under the circumstances,

it was objectively reasonable to "quit just ahead of the fall of the axe," *Kalinoski*, 435 F. Supp. 2d at 78 (quoting *Lindale v. Tokheim Corp.*, 145 F.3d 953, 956 (7th Cir. 1998))—then he has alleged a situation in which a reasonable person would have felt compelled to resign, thereby satisfying the adverse action requirement, and the only remaining question for Rule 12 purposes is whether the complaint states a claim under Title VII insofar as it contains sufficient allegations of discrimination by the defendant, inherent in the threat or otherwise. *See, e.g.*, *Nessar v. District of Columbia*, 962 F. Supp. 2d 234, 240–41 (D.D.C. 2013) (rejecting constructive-discharge theory at summary judgment because there was no evidence that a "threat of termination was discriminatory"); *Stewart*, 786 F. Supp. 2d at 168–69 (observing that "[a] discriminatory ultimatum [offering a choice between resignation and unwanted reassignment] could constitute a constructive discharge" (citations omitted)).

These principles carry Ross over the Rule 12 threshold. With respect to the requirement that he plead an adverse action, Ross's complaint contends, first of all, that he was "threatened with termination for inability to perform [his] duties even though he was fully able to perform them[.]" (Compl. at 11, ¶ 37.) The complaint specifically describes and incorporates by reference the letter that the HR Director sent to him, which stated that "she was recommending that he be terminated for his failure to meet the conditions of employment due to his inability to perform the duties of his position because of his inability to carry a firearm." (Compl. at 9–10, ¶ 29.) Ross also indicates that the threat to fire him was unjustified, as made manifest by the fact that the proffered reason for his termination (his inability to carry a firearm) was no longer an issue by the time USCP was considering the termination option. (*See id.* at 10, ¶ 31

("At the time Mr. Ross received the notice of intent to terminate, the one year Protective Order was on the verge of expiring, which would remove the bar from carrying a firearm."); *see also id.* ¶ 30 (asserting that, prior to his receipt of the proposed termination letter nearly one year after the events giving rise to the protective order, USCP "had not indicated that there was any need for Mr. Ross to take any action to obtain relief from the Civil Protective Order in order to remain employed").)

Critically, the complaint says that, in the face of what Ross believed to be a bogus threat of termination that was upheld by the Chief on appeal, Ross "was forced to make the [Hobson's] choice of either tendering his retirement application or placing his retirement annuity and other benefits . . . in jeopardy by continuing to fight his termination." (Compl. at 11, ¶ 37.) This, he asserts, "compelled [him] to retire in lieu of termination[.]" (*Id.* at 2, ¶ 7.) And the complaint goes further: it alleges that, in the midst of Ross's efforts to challenge the proposed termination decision administratively, the Chief stated in writing that "Officer Ross may of course opt to resign or retire prior to final approval [of his termination] by the Capitol Police Board[,]" (Compl. at 10, ¶ 34 (quoting Appeal Decision Letter at 4)), and that as Ross pondered "making the decision to retire," HR "advised him that his retirement would be in 'good standing[,]'" enabling him to retain critical benefits (*id.* at 11, ¶ 38).

Taken together, the complaint's allegations regarding (1) HR's proposed termination and the questionable reasons provided for it; (2) the Chief's letter upholding the firing proposal expressly suggesting that retirement in lieu of termination was an option; and (3) the alleged confirmation by an HR employee that any such retirement would be in good standing, are unquestionably sufficient circumstances to

compel a reasonable employee in Ross's position to retire. And it is precisely because these facts raise a plausible specter of forced (involuntary) retirement in order to avoid imminent termination that this Court rejects USCP's assertions regarding the insufficient nature of the adverse action alleged here. (*See* Def.'s Mot. at 1–2.)

Also plainly present in Ross's complaint are allegations of fact that, if true, support a reasonable inference that Ross was threatened with termination because of his race. One such allegation is the complaint's suggestion that the stated reason for his proposed firing could not have been the real reason for the threat of termination under the circumstances presented—*i.e.*, the complaint suggests that the proposal to terminate his employment was pretextual, as noted above. (*See* Compl. at 10, ¶¶ 30–31.) Other alleged indicia of USCP's discriminatory motives are found in the complaint's detailed discussion of USCP's treatment of Ross with respect to other aspects of his employment. For example, the complaint states that USCP discriminatorily denied Ross the opportunity to be placed on light duty instead of administrative leave, which Ross believes would have precluded any claim that he could not perform. (*See id.* at 11, ¶ 35.) He bolsters this claim by pointing to USCP's treatment of "similarly situated non-African American employees" who, he says, *were* placed on light duty after similar infractions. (*Id.* at 6–9, ¶¶ 23–24 (listing two white males, one white female, and one Hispanic male who were arrested and charged with driving under the influence and were placed on light duty).) Ross deploys comparators again with respect to the termination recommendation itself, averring that a white officer—who was placed on administrative leave and was subject to a protective order for domestic violence, like Ross—was not

recommended for termination and was instead permitted to return to work. (*See id.* at 6, ¶ 23.)

Thus, the complaint plausibly alleges that, with a discriminatory motive, USCP created the factual predicate for Ross's ostensibly performance-based termination by denying him the opportunity to perform notwithstanding his protective order (in contrast to other non-African American employees) and also by recommending him for termination as a result of the performance limitation (when no such recommendation was made for a similarly situated white employee), despite the pending expiration of the bar to his performance. (*See id.* at 11, ¶ 35 ("Had the agency placed Mr. Ross on light duty . . . , as it has done for similarly-situated non-African American officers . . . , it would have had no basis for trying to terminate him based on inability to [perform]."); *id.* at 13, ¶ 3 ("Defendant unlawfully discriminated . . . on the basis of race . . . , when it subjected Plaintiff to disparate treatment as compared to similarly situated non-African American employees).)[9] Therefore, treating the complaint's allegations as true and drawing all inferences in Ross's favor, *see NB ex rel. Peacock v. District of Columbia*, 682 F.3d 77, 82 (D.C. Cir. 2012), this Court finds that Ross's allegations of fact regarding the circumstances of his allegedly forced retirement, if proven true,

---

[9] To be sure, ultimately *proving* that Ross is similarly situated to other non-African American employees requires showing that the other employees "were charged with offenses of comparable seriousness and that all of the relevant aspects of [their] employment situation[s] were nearly identical[.]" *Wheeler v. Georgetown Univ. Hosp.*, 812 F.3d 1109, 1115–16 (D.C. Cir. 2016) (internal quotation marks and citation omitted). But, to survive a Rule 12 motion, the complaint does not need to go nearly that far (since this sort of evidence is not ever *required* to win a case). *See Swierkiewicz*, 534 U.S. at 511–12; *Ginger v. District of Columbia*, 527 F.3d 1340, 1344 (D.C. Cir. 2008). It is enough that, as pled, Ross's complaint contains facts indicating that his contention that the comparators were similarly situated and were treated more favorably is a plausible one. *See, e.g.*, *Winston v. Clough*, 712 F. Supp. 2d 1, 10 (D.D.C. 2010); *Ghawanmeh v. Islamic Saudi Acad.*, 672 F. Supp. 2d 3, 16 (D.D.C. 2009); *see also Montgomery v. Omnisec Int'l Sec. Servs., Inc.*, 961 F. Supp. 2d 178, 183–84 (D.D.C. 2013) (collecting cases); *cf. Wheeler*, 812 F.3d at 1116 (explaining that "determining whether two employees are similarly situated is ordinarily a question of fact for the jury" (citation omitted)).

would suffice to demonstrate that discrimination lurked behind the threat of termination in a manner that could lead a reasonable jury to conclude that USCP discriminated against him in violation of the Title VII standards that are applicable to the discrimination claim he brings under the CAA (Count I).

      2.   The Complaint Adequately Alleges That Ross's Forced Retirement Was Retaliatory

In addition to contending that Ross's forced retirement was a discriminatory act by USCP, Ross's complaint also alleges that this same adverse action was taken as a result of his prior protected activity. (*See* Compl. at 14, ¶ 12.) To support a retaliation claim, a plaintiff must plead facts that could give rise to a reasonable inference that his employer undertook the alleged adverse action because of his protected activity, *see Jones*, 557 F.3d at 677, and, specifically, such plaintiff must show that (1) he engaged in an activity that Title VII protects, (2) his employer took a materially adverse action against him, and (3) the employer took the action because of the protected activity. *See McGrath*, 666 F.3d at 1380 & n.3. Although this legal test is similar to the antidiscrimination framework on its face, there is one key difference: the concept of "adverse action" is broader in the retaliation context; that is, a materially adverse action for retaliation purposes "need not be confined to workplace action, so long as a reasonable employee would have found the challenged action materially adverse." *Bridgeforth v. Jewell*, 721 F.3d 661, 663 n.* (D.C. Cir. 2013) (internal quotation marks omitted) (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)). Thus, while claims under Title VII's antidiscrimination provision must rest on an adverse action that affects "the terms and conditions of employment," retaliatory

adverse actions "encompass[] a broader sweep of actions." *Id.* (internal quotation marks and citations omitted).

Applying these standards to the instant case, the protected-activity requirement is easily satisfied, because Ross has been a member of the *Blackmon-Malloy* class action for many years, as noted above, *see supra* Part I.A, and engaging in litigation is an activity that the CAA's retaliation provision plainly protects. *See* 2 U.S.C. § 1317(a) (proscribing any acts adverse to a covered employee "because" the employee has "participated in any manner in a hearing or other proceeding under this chapter"). With respect to the adverse-action requirement, Ross plausibly contends that he was forced to resign or retire in lieu of termination, as explained in Part III.B.1, and thus, sufficiently asserts that he has suffered an adverse action for retaliation purposes. *See, e.g.*, *Fercello v. Cty. of Ramsey*, 612 F.3d 1069, 1083 (8th Cir. 2010) ("Constructive discharge . . . is an adverse employment action that will support an action for unlawful retaliation." (internal quotation marks and citation omitted)). What is more, because the adverse action that is necessary to satisfy the elements of a retaliation claim need not rise to the level of a discharge at all, a reasonable jury could certainly find that the alleged facts regarding USCP's proposed notice of termination, standing alone, satisfy the adverse action requirement, because the HR letter recommending Ross's termination and the Chief's decision upholding that recommendation are actions "that could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Gaujacq v. EDF, Inc.*, 601 F.3d 565, 577 (D.C. Cir. 2010) (internal quotation marks omitted) (quoting *Burlington*, 548 U.S. at 57); *see Ali v. D.C. Gov't*, 810 F. Supp. 2d 78, 89 (D.D.C. 2011) ("A credible threat of termination might well dissuade a

reasonable employee from pursuing a charge of discrimination." (citing *Burlington*, 548 U.S. at 73)).

Finally, in regard to causation, Ross's complaint maintains that, "[b]y deciding to terminate [him] based on his inability to carry a firearm . . . and thereby force his involuntary retirement, [USCP] retaliated against [him] because of his protected activity." (Compl. at 14, ¶ 12.) As a factual basis for the contention that retaliation was the motivation behind the termination threat and strong suggestion that he ought to retire, Ross points to the same (allegedly) disparately treated officers he identified in the race-discrimination context, and alleges that, in addition to race, those officers also differed from him insofar as they had not previously engaged in protected EEO activity. (*See id.* at 6–9, ¶¶ 23–24.) Thus, Ross again wields comparator evidence, this time to allege that USCP engineered the conditions for his proposed termination on a retaliatory basis and then proposed the termination in a retaliatory manner, such that he was compelled to resign. Moreover, the temporal proximity of the protected activity and the proposed termination also gives rise to an inference of retaliation that is sufficient to survive USCP's motion to dismiss, because Ross was a member of the *Blackmon-Malloy* class during all of the events related to his allegedly forced resignation. *See Hamilton v. Geithner*, 666 F.3d 1344, 1357–58 (D.C. Cir. 2012); *see also Rochon v. Gonzales*, 438 F.3d 1211, 1220 (D.C. Cir. 2006) (explaining that the D.C. Circuit has "long held a causal connection . . . may be established by showing that the employer had knowledge of the employee's protected activity, and that the adverse . . . action took place shortly after that activity" (alterations in original) (internal quotation marks and citation omitted)).

Defendant's response to this analysis is cursory and entirely unpersuasive. USCP first reminds the Court that Ross's complaint "concedes" that a protective order prohibited him from possessing a firearm; that he resigned before he was actually terminated; and that the Chief's decision needed to be forwarded to the Capitol Police Board for final approval. (Def.'s Mem. at 29.) None of these "concessions" undermines the plausible constructive-discharge theory Ross alleges in his complaint. Nor does this argument cast any doubt on whether either of the letters proposing Ross's termination are material adverse actions in and of themselves.

On the causation front, USCP contends that Ross's protected activity is too distant from the events in this case to be considered. Apparently, Defendant believes that the only pertinent litigation events for proximity purposes are those *initiating* litigation, irrespective of whether that litigation continues. Thus, USCP argues, "the protected activity that occurred in 2005," by which it apparently means that the consolidation of Ross's individual suit with the broader *Blackmon-Malloy* class action, is too far from the adverse action to show causation. (Def.'s Reply at 17.) This Court rejects USCP's suggestion that Ross's participation in protected activity ended in 2005; that class action was then, and still is, ongoing. And there is no support in case law for the proposition that protected "participation" is limited to the single action that begins a proceeding. *See Hamilton*, 666 F.3d at 1358 (rejecting the idea that "only [the plaintiff's] first statutorily protected activity was relevant to the temporal proximity analysis"); *see also Turner v. U.S. Capitol Police Bd.*, 983 F. Supp. 2d 98, 108 n.5 (D.D.C. 2013) ("For purposes of analyzing temporal proximity, the courts in this

Circuit look at not only the filing of the complaint, but also subsequent protected activity." (citations omitted)).

In sum, this Court finds that the allegations of Ross's complaint suffice to state a claim for retaliation under the Title VII standards that are applicable to Ross's CAA claim (Count II), and therefore, contrary to USCP's assertions, Ross is entitled to proceed to discovery on that claim.

## IV. CONCLUSION

For the reasons stated above, this Court concludes that it lacks jurisdiction over Ross's claims that USCP's decision to place him on administrative leave and deny him accrued-leave payments constituted unlawful discrimination and retaliation in violation of the CAA, but it finds that Ross's related contentions that USCP constructively terminated him (because it forced him to resign due to his race and because he was engaged in protected activity) state a claim for discrimination and retaliation. Thus, as set forth in the accompanying order, those latter claims must be permitted to proceed.

DATE: June 30, 2016

*Ketanji Brown Jackson*
KETANJI BROWN JACKSON
United States District Judge